UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HARRY BENNETT,

                Plaintiff,                                    Hon. Paul L. Maloney

v.                                                  Case No. 1:07-CV-1005

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.
_____/


## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and

XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative

record, and provides that if the Commissioner's decision is supported by substantial evidence, it

shall be conclusive.

        Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## PROCEDURAL POSTURE

Plaintiff was 40 years of age at the time of the ALJ's decision.  (Tr. 20, 47).  He completed the eighth grade and worked previously as a nurse's aide, laborer, machine operator, and security guard.  (Tr. 80-98, 316).

Plaintiff applied for benefits on September 21, 2004, alleging that he had been disabled since January 1, 1999, due to "fallen arches," arthritis of the neck, and stomach problems.  (Tr. 47-49, 65, 339-40).  Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 21-46, 341-45).  On December 5, 2006, Plaintiff appeared before ALJ John Mondi, with testimony being offered by Plaintiff, Plaintiff's father, and vocational expert, Susan Rowe.  (Tr. 312-38).  In a written decision dated February 12, 2007, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 14-20).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 6-9).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## <u>RELEVANT MEDICAL HISTORY</u>

On January 23, 1996, Plaintiff reported to the emergency room complaining of left ankle pain. (Tr. 122-24). The results of an examination were unremarkable and x-rays of Plaintiff's left ankle were "unremarkable." (Tr. 122-24).

On December 3, 1999, Plaintiff was examined by Dr. Tim Buffey. (Tr. 211). Plaintiff reported that he was experiencing "discomfort" in his legs, shoulder, and neck. (Tr. 211). Plaintiff reported that he recently began a job "which involves a lot of stair climbing." (Tr. 211). An examination of Plaintiff's legs was unremarkable. (Tr. 211). Plaintiff exhibited "full" range of neck motion "without any limitations." (Tr. 211). Plaintiff was prescribed Skelaxin. (Tr. 211).

On January 5, 2000, Plaintiff was examined by Physician's Assistant (P.A.) William Ulrich. (Tr. 207-08). Plaintiff reported that he was experiencing "discomfort" in his cervical spine. (Tr. 207). Plaintiff reported that his job as a security guard required him to engage in a lot of walking and stair climbing. (Tr. 207). Plaintiff exhibited full range of motion in his shoulders and cervical spine with no evidence of neurologic deficit. (Tr. 207). Plaintiff also exhibited "good grip strength bilaterally." (Tr. 207).

On January 20, 2000, Plaintiff reported that he was "feeling better." (Tr. 206). Plaintiff attributed his improvement to medication, physical therapy, and the fact that his new security guard position did not require him to perform as much walking and no stair climbing. (Tr. 206). Plaintiff was instructed to continue participating in physical therapy. (Tr. 206).

On March 10, 2000, Plaintiff was examined by Dr. Harry Arthur. (Tr. 145-46). Plaintiff reported that he was experiencing neck and shoulder pain. (Tr. 145). An examination of Plaintiff's cervical spine revealed tenderness and slightly reduced range of motion. (Tr. 145). An

examination of Plaintiff's shoulder revealed pain free range of motion.  (Tr. 145).  Plaintiff exhibited "good grip strength" and "good sensation."  (Tr. 145-46).  X-rays of Plaintiff's cervical spine revealed "very mild degenerative changes."  (Tr. 147).

On March 28, 2000, Plaintiff was examined by P.A. Ulrich.  (Tr. 202).  Plaintiff reported that his neck pain was "improved."  (Tr. 202).  Plaintiff reported that he recently began working 12 hours daily as a security guard which increased his foot pain.  (Tr. 202).  An examination of Plaintiff's feet revealed "mild pes planus."[1]  (Tr. 202).  Plaintiff was limited to working 8 hours daily.  (Tr. 202).

On April 19, 2000, Plaintiff was examined by Dr. Roger DeYoung.  (Tr. 141).  Plaintiff reported that he was experiencing "painful heels."  (Tr. 141).  Plaintiff exhibited 5/5 strength, but walked with an "abducted gait."  (Tr. 141).  X-rays revealed "normal arch contour" with no evidence of spur formation, cyst, or arthrosis.  (Tr. 141).  Plaintiff was diagnosed with bilateral plantar fasciitis[2] and collapsing pes valgus.[3]  (Tr. 141).  Plaintiff was prescribed custom orthotics.  (Tr. 141).

On November 14, 2000, Plaintiff reported that his heels feel "somewhat better" when he wears his orthotics.  (Tr. 140).  On December 13, 2000, Plaintiff reported that he was still experiencing heel pain, for which physical therapy was prescribed.  (Tr. 140).  On January 16, 2001,

---

[1] Pes planus is also known as "flatfoot," a condition "in which the longitudinal arch in the foot, which runs lengthwise along the sole of the foot, has not developed normally and is lowered or flattened out."  *See* Flatfoot (Pes Planus), available at, http://www.webmd.com/a-to-z-guides/flatfoot-pes-planus-topic-overview (last visited on December 30, 2008).

[2] Plantar fasciitis is "the most common cause of heel pain" and results when the plantar fascia, the ligament that connects the heel bone to the toes, gets weak, swollen, and irritated, causing the heel or the bottom of the foot to hurt when standing or walking.  *See* Plantar Fasciitis, available at http://www.webmd.com/a-to-z-guides/plantar-fasciitis-topic-overview (last visited on December 30, 2008).

[3] Pes valgus refers to an "eversion of the foot, the inner side alone of the sole resting on the ground."  *See* Pes Valgus, available at http://www.biology-online.org/dictionary/Pes_valgus (last visited on December 30, 2008).

Plaintiff reported that his feet were "feeling better" and that his pain "has gone down considerably." (Tr. 140).

On April 17, 2001, Plaintiff participated in a barium enema, the results of which were "normal." (Tr. 229). On June 4, 2001, Plaintiff participated in a CT examination of his abdomen, the results of which were "negative." (Tr. 228).

On April 1, 2002, Plaintiff was examined by Dr. Jeffrey Leinicke. (Tr. 164). Plaintiff reported that he was experiencing constipation. (Tr. 164). A CT scan of Plaintiff's abdomen was "quite normal" and a barium enema "demonstrated no evidence of an obstructing process of the colon." (Tr. 164). A physical examination was "completely normal." (Tr. 164). Plaintiff was instructed to participate in "a regimen of prunes, dietary fiber, increased water, and exercise as well as the use of a bulk agent." (Tr. 161).

On December 8, 2003, Plaintiff was examined by Dr. Charles Feldt. (Tr. 175). Plaintiff reported that he was experiencing bilateral foot pain. (Tr. 175). An examination of Plaintiff's feet revealed plantar tenderness, but no evidence of swelling or ecchymosis. (Tr. 175). Plaintiff exhibited full range of foot motion and there was no evidence of neurovascular, motor, or sensory deficit. (Tr. 175). X-rays of Plaintiff's feet were unremarkable with no evidence of fracture, dislocation, bony abnormality. (Tr. 173-74). On December 18, 2003, Plaintiff reported that he was presently working as a security guard, a job which required him to walk "all the time." (Tr. 189).

On December 22, 2003, Plaintiff was examined by P.A. Matthew Tripp. (Tr. 167). Plaintiff reported that he was still experiencing foot pain , but that he was walking "okay." (Tr. 167). An examination of Plaintiff's feet revealed plantar tenderness, but no evidence of ecchymosis

or ankle tenderness.  (Tr. 167).  Plaintiff was able to "dorsiflex and plantar flex without difficulty against resistance."  (Tr. 167).  Plaintiff was cleared to work with "no restrictions."  (Tr. 167).

Treatment notes dated March 9, 2004, reveal that Plaintiff's "bowels" were "stable." (Tr. 185).

On March 23, 2004, Plaintiff was examined by P.A. Ulrich.  (Tr. 184).  Plaintiff reported that he was experiencing neck "discomfort."  (Tr. 184).  An examination of Plaintiff's neck revealed "no decrease in range of motion, restriction in flexion, restriction in extension or restriction in rotation."  (Tr. 184).  On April 13, 2004, Plaintiff was examined by P.A. Ulrich.  (Tr. 182).  An examination of Plaintiff's neck and shoulders revealed full and pain free range of motion with no evidence of sensory or motor abnormality.  (Tr. 182).

On October 10, 2004, Plaintiff completed a report regarding his activities.  (Tr. 72-79).  Plaintiff reported that he cleans his house, washes laundry, prepares meals, shops, reads, talks on the telephone, visits with friends, and watches television.  (Tr. 73-76).  Plaintiff also reported that "play[s] sports - 2 times a week."  (Tr. 76).

On January 24, 2005, Plaintiff participated in a consultive examination conducted by David Cashbaugh, M.A., L.L.P.  (Tr. 242-47).  Plaintiff reported that he was unable to work due to "fallen arches" and "arthritis in his neck."  (Tr. 242).  Plaintiff reported that he likes to watch television, play video games, and "spend his father's money."  (Tr. 244).  Plaintiff reported that he also goes camping with his father.  (Tr. 244).  Plaintiff reported that "if he walks too much his feet hurt [and] if he sits too much his arthritis bothers him."  (Tr. 242).  Cashbaugh observed that Plaintiff "did not appear to be in much pain" and "was able to remain seated throughout the hour long examination without apparent difficulty."  (Tr. 246).  The results of a mental status examination

7

were unremarkable and Plaintiff was diagnosed with "psychological factors affecting general medical conditions." (Tr. 245-47). Plaintiff's GAF score was rated as 56.[4] (Tr. 247).

On February 14, 2005, Mark Garner, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 253-67). Determining that Plaintiff suffered from a personality disorder and psychological factors affecting his general medical condition, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.07 (Somatoform Disorders) and Section 12.08 (Personality Disorders) of the Listing of Impairments. (Tr. 255-63). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 264). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. *Id.*

Dr. Garner also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 249-52). Plaintiff's abilities were characterized as "moderately limited" in five categories. (Tr. 249-50). The doctor characterized Plaintiff as "not significantly limited" with respect to fourteen of the remaining categories. (Tr. 249-50). The doctor failed to rate Plaintiff's ability in the one remaining category. (Tr. 250). Dr. Garner concluded that Plaintiff "retains the mental residual functional capacity to do simple tasks on a sustained basis, within his physical limitations." (Tr. 251).

---

[4] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 56 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

On July 11, 2005, Plaintiff was examined by Dr. DeYoung.  (Tr. 279).  Plaintiff reported that he was experiencing stiffening and cramping in the toes of his left foot.  (Tr. 279).  An examination of Plaintiff's left foot revealed no ecchymosis, swelling, or pain in the tarsal canal.  (Tr. 279).  Plaintiff's toes were "straight" and the tendons were neither taut nor contracted.  (Tr. 279).  The doctor advised Plaintiff "to continue stretching [and] stay away from long periods of standing and walking that would aggravate his plantar fascitis."  (Tr. 279).

In August 2006, Plaintiff participated in intelligence testing, the results of which revealed that he possesses a verbal IQ of 71, a performance IQ of 64, and a full-scale IQ of 65, which placed Plaintiff in the "cognitively impaired range regarding overall mental ability."  (Tr. 282-84).

At the administrative hearing, Plaintiff amended his onset date of disability to August 1, 2004.  (Tr. 316).  Plaintiff testified that he worked as a security guard from 1998 to 2004.  (Tr. 316-17).  Plaintiff testified that prior to working as a security guard, he worked performing maintenance duties for 8-10 years for one employer.  (Tr. 317).  Plaintiff testified that he was unable to work because of his neck "condition," a stomach "problem," and plantar fascitis.  (Tr. 318-19).  Plaintiff testified that he can walk two blocks, stand for 15 minutes, and sit for 40 minutes.  (Tr. 319-20).  He reported that during the day he watches television, does "stuff" with his dad, and plays cards with his friends.  (Tr. 322-23).  Plaintiff reported that he lived alone, but was unable to care for himself.  (Tr. 321).  Specifically, Plaintiff testified that his dad has to clean his house, cook his meals, and wash his laundry.  (Tr. 321-22).  Plaintiff stated that, "I do very little for myself because my dad's been supporting me and just taking care of me and doing everything for me."  (Tr. 324).

9

# ANALYSIS OF THE ALJ'S DECISION

## A.  Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

## B.  The ALJ's Decision

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) an unspecified "mental impairment;" (2) plantar faciitis; (3) degenerative joint disease; and (4) a history of alcohol abuse.  (Tr. 17)  The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr.

---

[5] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

18).  The ALJ concluded that because Plaintiff was able to perform his past relevant work as a security guard, he was not disabled as defined by the Social Security Act.  (Tr. 19).

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure.  While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff experiences the following physical limitations: (1) he can occasionally lift/carry 20 pounds, (2) he can frequently lift/carry 10 pounds, (3) he can sit for six hours during an 8-hour workday; (4) he can stand/walk for six hours during an 8-hour workday; (5) he cannot climb ladders, ropes, or scaffolds; (6) he cannot engage in constant pushing or pulling activities with his lower extremities; (7) he can occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs; and (8) he cannot reach overhead.  (Tr. 18).  With respect to Plaintiff's non-exertional limitations, the ALJ concluded that

Plaintiff suffers moderate limitations in the following areas: (1) ability to carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted; (4) interact with the general public; and (5) get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 18). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

a. Plaintiff does not meet the requirements of section 12.05 of the Listing of Impairments

Plaintiff asserts that he is entitled to disability benefits because he satisfies the requirements of section 12.05 (Mental Retardation) of the Listing of Impairments. The ALJ found that Plaintiff's impairments did not meet the requirements of this (or any other) listing.

Section 12.05 of the Listing provides, in relevant part, the following:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

12

    C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;

OR

    D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

        1.  Marked restriction of activities of daily living; or

        2.  Marked difficulties in maintaining social functioning; or

        3.  Marked difficulties in maintaining concentration, persistence or pace; or

        4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.05 (2007).

Specifically, Plaintiff asserts that he satisfies section 12.05(C). As noted above, testing revealed that Plaintiff possesses a verbal IQ of 71, a performance IQ of 64, and a full-scale IQ of 65. That this test was not administered until after Plaintiff attained the age of 22 is of no consequence. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (in analyzing a claim under section 12.05, the court concluded that "absent evidence of sudden trauma that can cause retardation," IQ tests create a rebuttable presumption of a fairly constant IQ throughout a claimant's life. Moreover, Plaintiff suffers from a physical impairment which imposes additional and significant work-related limitations, as evidence by the ALJ's RFC determination.

While Plaintiff satisfies the criteria articulated in subsection (C), he must also satisfy the requirements articulated in the introductory paragraph of Section 12.05. 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00(A) ("[i]f your impairment satisfies the diagnostic description in the

13

introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets" section 12.05). Specifically, Plaintiff must establish that he satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05. *Cooper v. Commissioner of Social Security*, 217 Fed. Appx. 450, 451 (6th Cir., Feb. 15, 2007); *see also*, *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (to satisfy Section 12.05, the claimant must demonstrate that he experienced deficiencies in adaptive functioning prior to attaining the age of 22).

The record contains no evidence that Plaintiff experienced deficiencies in adaptive behavior or suffered from mental retardation prior to the age of 22 or at anytime after age 22. While Plaintiff asserts in his brief that he suffered "a brain injury before age 22 [which] produced a low IQ," the evidence of record provides absolutely no support for this assertion. Neither Plaintiff's care providers nor any of the medical professionals who examined the record in this case concluded that Plaintiff was mentally retarded or satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05.

Plaintiff's behavior and activities likewise fail to support Plaintiff's argument that he satisfies Section 12.05. Plaintiff has maintained employment throughout much of his adult life. He has also reported engaging in a wide range of activities inconsistent with the conclusion that he is mentally retarded. Such facts indicate that Plaintiff did not experience deficiencies in adaptive behavior prior to age 22, or thereafter for that matter. *See Burrell v. Comm. of Soc. Sec.*, 2000 WL 1827799 at *2 (6th Cir., Dec. 8, 2000) (no evidence of a deficit in adaptive functioning where claimant "remained fairly active, maintains an interest in his household, and enjoys apparent satisfactory relationships with family members"); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir.

14

2000) (claimant with a 10th grade education, who worked as an oil-changer, not disabled under section 12.05); *Williams v. Sullivan*, 970 F.2d 1178, 1185 (3rd Cir. 1992) (claim of mental retardation contradicted by the fact that claimant was able to "maintain a job for most of his adult life"); 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00(D) (recognizing that when evaluating mental disorders, a claimant's work history is "particularly useful" in assessing the extent of impairment); *see also*, *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir. 1997) ("a valid IQ score need not be conclusive of mental retardation, where the IQ score is inconsistent with other evidence in the record concerning the claimant's daily activities and behavior").

As articulated herein, therefore, the Court concludes that Plaintiff has not presented evidence from which it can reasonably be determined that he met the diagnostic definition of mental retardation prior to age 22 (or at anytime thereafter). Thus, Plaintiff has not met his burden of demonstrating that he satisfies the requirements of section 12.05 of the Listing of Impairments. *See Kirby v. Comm'r of Soc. Sec.*, 2002 WL 1315617 at *1 (6th Cir., June 14, 2002) (the burden rests with the claimant to establish that he meets a listed impairment).

### b. The ALJ Properly Evaluated the Medical Evidence

On July 11, 2005, Dr. DeYoung "advised" Plaintiff "to continue stretching [and] stay away from long periods of standing and walking that would aggravate his plantar fascitis." (Tr. 279). Plaintiff claims that this "advice" constitutes a medical opinion from his treating physician. Plaintiff asserts that when properly considered, Dr. DeYoung's opinion demonstrates he is disabled. Plaintiff further asserts that because the ALJ "gave no reason for rejecting" Dr. DeYoung's opinion, he is entitled to relief.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

As the Sixth Circuit has clearly held, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so.  *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion."  A Social Security Ruling

16

> explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

Plaintiff asserts that by "ignoring" Dr. DeYoung's opinion, the ALJ violated the *Wilson* rule. The Court disagrees.

The relevant Social Security regulation defines a "medical opinion" as a statement that "reflect[s] judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The statement in question does not articulate any limitations on Plaintiff's ability to function, but instead merely advises Plaintiff that his condition *may* be aggravated if he fails to stretch or engages in "long periods" of standing and walking. The fact that certain activities may aggravate Plaintiff's condition does not necessarily mean that he is incapable or restricted from engaging in such activities. The Court, therefore, finds

17

that Dr. DeYoung's statement does not constitute an "opinion" for purposes of this regulation. *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) (statements by a doctor in which no medical judgment is offered are not "medical opinions" to which the *Wilson* rule applies).

Moreover, Dr. DeYoung's statement of advice is simply too vague to permit serious analysis. Plaintiff asserts that the doctor's statement is inconsistent with the ALJ's RFC determination. However, without knowing what Dr. DeYoung considers to be a "long period" of standing and walking, Plaintiff's argument is based on nothing more than speculation.

In sum, the Court finds that because the statement in question is not a medical "opinion," the ALJ's failure to specifically address the statement does not violate the rule articulated in *Wilson*. Moreover, the Court finds that to the extent that the statement in question is interpreted as contrary to the ALJ's RFC determination that such interpretation is contradicted by substantial evidence as detailed above. Thus, this claim is without merit.

c.   The ALJ Properly Evaluated Plaintiff's Credibility

As noted above, the ALJ determined that Plaintiff can occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. At the administrative hearing, Plaintiff testified that he can only lift "up to ten pounds." (Tr. 320). The ALJ discounted Plaintiff's subjective allegations, finding that his testimony "was not credible" considering the "objective medical evidence as well as claimant's activities." (Tr. 18). Plaintiff asserts that the ALJ failed to give proper weight to his subjective allegations and that when his testimony is properly considered such demonstrates that he is disabled.

18

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)).  Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531.  This standard is often referred to as the *Duncan* standard.  *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).  However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record."  *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference."  *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d

at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony").   It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.   The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should not be lightly disregarded.   *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

        As the ALJ correctly concluded, Plaintiff's testimony that he cannot lift more than ten pounds is contradicted by the objective medical evidence and Plaintiff's reported activities.   The Court further notes that none of Plaintiff's care providers ever expressed the opinion that Plaintiff was not capable of lifting 20 pounds as determined by the ALJ.   The Court finds, therefore, that there exists substantial evidence to support the ALJ's credibility determination.

        d.   The ALJ's Step Five Determination

        As noted above, the ALJ found that because Plaintiff retained the ability to perform his past relevant work as a security guard he was not disabled.   The ALJ also determined that in the event that Plaintiff was deemed incapable of performing his past relevant work that there nonetheless existed a significant number of jobs he could perform despite his impairments.   Thus, the ALJ found Plaintiff not disabled at step four of the five step sequential process identified above and, in the alternative, determined that Plaintiff was also not disabled at step five of the sequential process.   Plaintiff asserts that he is entitled to relief because the ALJ "mishandled step five" and failed to carry his burden of proof at step five of the sequential process.

As discussed above, the ALJ's determination that Plaintiff retains the ability to perform his past relevant work as a security guard is supported by substantial evidence. Because the ALJ's step four determination is supported by substantial evidence, the Court need not address Plaintiff's argument that the ALJ's step five determination is in error because even if true, such would not entitle Plaintiff to the relief he seeks.

## **<u>CONCLUSION</u>**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  January 8, 2009                          /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge